The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Chapman. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award except with regard to the suspension of benefits as a result of non-compliance with vocational rehabilitation.
The Full Commission finds as a fact and concludes as a matter of law the following, which was entered into by the parties at the hearing as a
STIPULATION
1. A Form 21 agreement has been approved in the case and is incorporated by reference.
2. Defendants paid compensation to plaintiff from May 18, 1990 to the date of hearing.
3. In addition the parties stipulated into evidence the following:
1. Packet of medical records and reports.
2. Form 24 in the Commission file.
 3. Two letters from Martha Barr dated March 4 and January 12, 1994.
* * * * * * * * * * *
The Full Commission adopts the findings of fact found by the Deputy Commissioner and finds as follows:
FINDINGS OF FACT
1. Plaintiff is a 59 year old woman with an eleventh grade education. In approximately November 1989, she began working for defendant-employer as a clerk in the convenience store. On May 18, 1990, she sustained a compensable injury by accident when her foot slipped off of a curb and she fell, breaking her right hip. After assessment in the emergency room, she was referred to Dr. Rodgers, an orthopedic surgeon, who diagnosed her condition as a displaced intertrochanteric fracture and who performed surgery on May 19, 1990 to reduce the fracture with internal fixation. He used screws and a plate to stabilize the bone.
2. Following the surgery, plaintiff used a walker to ambulate and slowly increased her activities. The fracture healed in good position but she continued to complain of pain. However, in November she began to make progress and was later able to wean herself off of her cane. Although her hip pain lessened, she began to have problems with her right knee and complained of the leg feeling as though it were going to give way. In November 1991 her knee apparently buckled and she fell. At that point her knee problems were more bothersome but she also continued to have pain in her hip, therefore Dr. Rodgers recommended that the hardware be removed. Dr. Oakley examined her in January 1992 and concurred with the recommendation. Consequently, on February 21, 1992, she underwent a second operation to have the plate and screws removed from her hip.
3. Plaintiff's hip pain improved after the surgery but she still experienced some pain in her thigh. Dr. Rodgers sent her to physical therapy and began discussing with her his expectations regarding her returning to work. Her former job with defendant employer involved long periods of standing as well as lifting and bending activities in order to stock the shelves. Consequently, he advised her that she would not be able to return to work in that capacity. In August 1992 he released her to return to work for four hours per day with no lifting of over 10 to 15 pounds, no carrying, climbing or crouching, and limited walking until her gait improved. Defendant-employer did not have work within those restrictions, consequently defendants hired American Rehabilitation to provide vocational placement services. Edwina Smith was assigned to plaintiff's case.
4. Ms. Smith met with plaintiff in September. Although plaintiff was willing to return to work, she had strong reservations because she did not believe she had the physical ability or stamina at that point to be able to hold down a job. Besides her hip and knee problems, she had chronic obstructive pulmonary disease due to her heavy smoking, frequent headaches and complaints of fatigue and generalized pain. She also indicated that she had struggled with depression since the birth of one of her children. Ms. Smith also had reservations about plaintiff's returning to work and advised the insurance carrier which instructed her to proceed with vocational placement services.
5. Over the next several months, Ms. Smith canvassed the Laurinburg area for suitable employment without success. In January 1993 plaintiff fell and injured her left elbow. As a result, in February Dr. Rodgers advised Ms. Smith that it would be two to three months before he would release her for job placement. Consequently, vocational rehabilitation efforts would have been suspended. However, on February 2, 1993, plaintiff's attorney met with Ms. Smith and advised her that he would not permit plaintiff to participate in further vocational rehabilitation activities and that they were not in his client's best interests. Thereafter, Ms. Smith put her file on hold.
6. The next summer when Dr. Rodgers released plaintiff to resume her job search, he placed more restrictions on her activities than he had the previous year. He limited her to working two to three hours per day with no lifting of over 5 to 10 pounds on an intermittent basis, standing of twenty to thirty minutes and walking intermittently with a cane. Ms. Smith reopened her file and wrote to Mr. Lindler to request permission to resume vocational placement efforts, but he refused to allow them. Consequently, defendants subsequently filed a Form 24 request to stop payment with the Industrial Commission. The Form 24 was denied on the basis that defendants had stopped payment several months before without permission. However, by letter dated January 12, 1994 Martha Barr, the Chief Claims Examiner, ordered plaintiff to cooperate with rehabilitation. By subsequent letter she inquired as to whether a functional capacity evaluation had been performed. There is no evidence of record of any response to her letter and furthermore there is no evidence of record to indicate that a functional capacity evaluation was ever performed, even after the implied suggestion of Ms. Barr.
7. While the issue of termination of benefits was pending, plaintiff was seeing a new doctor, Dr. Young, who was a neurologist. He was evaluating her complaints of bilateral leg pain and weakness. When he saw her on December 6, 1993, he reviewed earlier nerve tests which showed evidence of defuse axonal polyneuropathy and defuse denervation changes. He was of the impression that polyneuropathy was contributing to her difficulty in walking. Over the next several months, he ordered a number of diagnostic tests, including an MRI of her lumbar spine which revealed moderate to severe degenerative disc disease at L4-5 and L5-S1 with small disc protrusions and spinal stenosis at L4-5. Her nerve tests results were not typical of spinal stenosis but there was evidence of chronic radiculopathies. His last office note of June 16, 1994 he recommended further evaluation with referrals to other specialties because he had not been able to identify specifically the etiology of her symptoms and abnormal nerve tests results.
8. Defendants have admitted liability for benefits under the Workers' Compensation Act for plaintiff's injury of May 18, 1990 and have continued to pay compensation to her for temporary total disability. She has not returned to work since the injury and, pursuant to instructions from her attorney, has not cooperated with vocational rehabilitation despite being ordered to do so by the Industrial Commission on January 12, 1994. In addition, plaintiff has not undergone a functional capacity evaluation since Ms. Barr's recommendation subsequent to the Order.
9. At the time of her injury at work, plaintiff had a number of health problems, including chronic obstructive pulmonary disease and a history of back problems. She had had two operations to her back in the 1970s. She was almost 54 years old. Following the injury, she developed additional problems besides those with her hip. The problems with her right knee were related to her hip injury, and Dr. Rodgers so advised defendants in June 1993. When Dr. Rodgers released her to resume vocational placement activities in August 1993, her restrictions were quite limiting in terms of the number of hours she could work and her permitted activities. She had an eleventh grade education and had worked in basically unskilled positions during her adult life. Her primary work experience was in the textile industry where she had sorted dish cloths and laid out towels, and in convenience and grocery stores where she had worked as a cashier and stocker. However, she had also done some waitressing work.
10. Ms. Smith had not been able to find suitable employment for plaintiff during the three to four months she looked and during that time the restrictions were not as limiting as they were after August 1993. The Laurinburg area was not urban and there were a limited number of positions available at any given time. However, Ms. Smith recognized that the process could take over a year and did not consider it to be futile.
11. In view of the leg weakness and pain for which Dr. Young evaluated and treated plaintiff beginning in December 1993, her restrictions could not be presumed to have remained at the level Dr. Rodgers indicated in August 1993. Dr. Rodgers retired at some time after that date so he did not evaluate her after she began seeing Dr. Young. She did not undergo a functional capacity evaluation thereafter, and Dr. Young did not indicate what he considered her work capacity to be. The neurologic problems would be presumed to add further limitations to her already significant impairment in that the leg weakness was causing her to be subject to falling.
12. Despite these factors, plaintiff should have cooperated with vocational rehabilitation. Therefore, plaintiff must undergo a functional capacity evaluation as previously suggested to determine her capacity to work and to the extent of the outcome of such evaluation, plaintiff must comply with the January 12, 1994 Order of the Commission and participate in vocational rehabilitation.
13. Plaintiff remained unable to work up through the Commission's January 12, 1994 Order at which time her benefits should be suspended until the functional capacity exam is performed and she complies with vocational rehabilitation according to the results of the evaluation.
14. The evidence does not establish that plaintiff had reached maximum medical improvement with respect to all of the conditions which resulted from her May 18, 1990 injury by accident.
* * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
CONCLUSIONS OF LAW
1. Plaintiff's refusal of vocational rehabilitation was not justified. Defendants are entitled to suspend plaintiff's compensation as of January 12, 1994 pending a functional capacity evaluation and considering such evaluation, plaintiff's cooperation with vocational rehabilitation. Plaintiff is entitled to temporary total disability at the rate of $130.01 per week through January 12, 1994, the date of the Order suspending plaintiff's benefits for non-compliance with vocational rehabilitation. N.C. Gen. Stat. § 97-29 and § 97-25.
2. Plaintiff is entitled to have defendants provide all medical compensation arising from this injury by accident. N.C. Gen. Stat. § 97-2 (19) and § 97-25.
* * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
AWARD
1. Defendants shall pay continuing compensation for temporary total disability at the rate of $130.01 per week through January 12, 1994 pending a functional capacity evaluation and considering such evaluation, plaintiff's cooperation with vocational rehabilitation. This award is subject to the attorneys fee hereinafter approved.
2. Defendants shall pay all medical expenses incurred by plaintiff as a result of this injury by accident.
3. An attorney's fee in the amount of 25% of the accrued compensation paid pursuant to this award is approved for plaintiff's counsel. Thereafter, he shall receive every fourth check.
4. Defendants shall pay the costs including an expert witness fee in the amount of $300.00 to Dr. Ballentyne to the extent such fee is not already paid.
ORDER
1. Plaintiff shall undergo a functional capacity evaluation to determine her wage earning capacity and what work is suitable for her.
2. Thereafter, plaintiff shall comply with vocational rehabilitation efforts consistent with the evaluation pursuant to the January 12, 1994 Order. If a dispute should arise between the parties regarding the plaintiff's cooperation with vocational rehabilitation after the results of the functional capacity evaluation, the undersigned must be notified immediately.
 S/ _________________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
S/ _________________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
S/ _________________________ J. HOWARD BUNN, JR. CHAIRMAN